## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **SEAPORT GLOBAL HOLDINGS, LLC,** | **CIVIL ACTION** |
| Plaintiff, Counterclaim-Defendant, |  |
| *v.* | **NO. 23-1422-KSM** |
| **POWERPAY, LLC,** |  |
| Defendant, Counter-Claim Plaintiff, |  |
| *v.* |  |
| **MICHAEL HISLER,** |  |
| Counter-Claim Defendant. |  |

### MEMORANDUM

**MARSTON, J.**                                                    **August 2, 2025**

Though a contract may not be a model of clarity, that alone does not make it ambiguous. In this contentious business dispute, Seaport Global Holdings, LLC ("Seaport") agreed to introduce PowerPay, LLC ("PowerPay") to investors who would fund consumer loans on PowerPay's online lending platform. Unfortunately, a dispute over fees erupted, and the relationship between Seaport and PowerPay soured. Seaport now sues PowerPay to recover unpaid fees under the parties' contract. (Doc. No. 1.) PowerPay has moved for partial summary judgment on Seaport's breach of contract claim. (Doc. No. 63.) It argues that Seaport's requested fees are too high because (1) Seaport has misread the contract's compensation provision and (2) Seaport is not entitled to fees as a matter of law for introducing Valley Strong Credit Union ("Valley Strong") to PowerPay. (*Id.*) Seaport disagrees on both issues. (Doc. No. 74.) For the reasons below, the Court agrees with PowerPay on the first issue but not the second.

The Court thus grants in part and denies in part PowerPay's motion for partial summary judgment.

## I.    Background

### A.    PowerPay Retains Seaport to Find Investors to Fund Loans on its Platform

In 2018, Michael Petrakis and David Haas co-founded a company called PowerPay. (Doc. No. 63-24 at 28–29.[1])  PowerPay is a financial technology ("Fintech") company that operates an online platform where consumers can apply for and obtain loans for home improvement projects.  (Doc. No. 74-1 at 3.)  Though PowerPay operates an online lending platform, it does not itself fund the loans offered on its platform.  (*Id.*)  Instead, it contracts with investors—mostly credit unions—to do so.  (*Id.*)  Because PowerPay relies on investors to fund the loans on its platform, PowerPay retains "introducing agent[s]" to connect it to prospective investors.  (*See, e.g.*, Doc. No. 74-4.)

In April 2020, PowerPay entered negotiations with Seaport and its employee, Mike Hisler, to retain them as an introducing agent.  (*See* Doc. No. 74-5.)  Seaport is a capital markets and investment banking firm with offices around the world, and Hisler is a financial professional and investment banker with decades of experience.  (Doc. No. 74-1 at 2.)  Petrakis knew Hisler from his employment prior to Seaport.  (Doc. No. 63-21 at 88–89.)  After weeks of negotiations and with the assistance of counsel, PowerPay and Seaport signed a contract on May 19, 2020. (Doc. No. 63-3.)

---

[1] PowerPay did not file full-page deposition transcripts in connection with its motion for partial summary judgment on the docket.  (*See* Doc. Nos. 63-20–63-25.)  So the Court directed PowerPay to email reformatted, full-page deposition transcripts to Chambers.  Unless specified otherwise, the Court cites to Doc. Nos. 63-20–25 using the pagination of the full-page deposition transcripts.

Under the parties' contract, Seaport agreed to act as PowerPay's "introducing agent" and devote its "commercially reasonable efforts" to introduce prospective investors to PowerPay. (*Id.* at 2.)  In exchange, Seaport would earn a fee if an investor that it introduced to PowerPay funded loans on PowerPay's platform.  (*Id.* at 5.)  Specifically, the parties agreed to the following compensation provision: "Seaport shall be entitled to 50 basis points (the "*Seaport Fee*") on funded Transactions originated by Investors introduced by Seaport to [PowerPay], which shall be earned for the duration of any Loans underlying such Transactions (to the extent of repayment thereon) and paid within 15 days of the end of each calendar quarter."  (*Id.*)

Elsewhere in the contract, the parties agreed that Seaport would not earn its fee if PowerPay had a "prior relationship" with a prospective investor unless PowerPay agreed otherwise.  (*Id.* at 3.)  Pursuant to the contract, "approved Investors" would be included on a list attached to the agreement as "Exhibit A," which would be "updated from time to time."  (*Id.*) The contract had a one-year term, but it would "automatically extend[ ]" if PowerPay and a prospective investor were "in continued communications regarding a contemplated Transaction." (*Id.*)  And finally, the contract contained a merger clause, which explained that the executed contract "contains the entire agreement" of the parties and "all prior communications, negotiations and agreements" are merged into the executed contract.  (*Id.* at 5.)

### B.    Seaport Introduces American Heritage to PowerPay

After PowerPay and Seaport signed the contract in spring 2020, Hisler introduced Petrakis and Haas to Brian Schmitt, the Chief Financial Officer of American Heritage Federal Credit Union ("American Heritage").  (Doc. No. 74-1 at 23.)  Following this introduction, American Heritage and PowerPay reached an agreement for American Heritage to fund consumer loans on PowerPay's platform.  (*Id.*)  From November 2020 to September 2022,

3

American Heritage funded over a hundred million dollars in loans on PowerPay's platform. (*Id.*; Doc. Nos. 69-12; 74-3 at 8.) Because Seaport had introduced American Heritage to PowerPay, Seaport was entitled to fees on these loans.

### C.    Valley Strong Funds Loans on PowerPay's Platform

In January 2021, Seaport and Hisler hired a third-party consultant called Credit Union 2.0 ("CU2"). (Doc. No. 63-20 at 378.) Seaport and Hisler believed that CU2 would give them access to executives and decision-makers at various credit unions. (*Id.* at 378–79, 387.) Through CU2's connections, Seaport and Hisler aimed to introduce PowerPay to more prospective investors.

On March 1, 2021, CU2 held a "Quarterly Fintech Call" with Nick Ambrosini, the Chief Financial Officer of Valley Strong. (Doc. No. 74-1 at 25.) On the call, CU2 spotlighted five Fintech companies, one of which was PowerPay. (Doc. No. 63-11 at 2.) Later that day, Hisler emailed Petrakis and Haas to share that he had spoken to Valley Strong who "understand[s] the idea." (Doc. No. 63-12 at 2.) Hisler then scheduled a call for March 8, 2021 between Petrakis, Haas, Ambrosini, and Chuck Smith, the Chief Lending Officer of Valley Strong. (Doc. No. 74-1 at 25–26.) Several months later, in the fall of 2021, Valley Strong and PowerPay reached an agreement for Valley Strong to fund loans on PowerPay's platform. (*Id.* at 39.)

Though Hisler and Seaport facilitated the introduction, PowerPay contends that Seaport is not entitled to fees because Petrakis and Smith had a prior relationship. (Doc. No. 63-23 at 283.) Petrakis and Smith had done business before when Smith was the Chief Lending Officer of Texas Dow Employees Credit Union ("TDECU"), which had joined PowerPay as a lender. (Doc. No. 63-25 at 13–14.) Based on their prior relationship, Smith recommended that Valley Strong take the PowerPay opportunity seriously and ultimately recommended that Valley Strong

should fund loans on PowerPay's platform. (*Id.* at 19–20.) While Petrakis and Smith had a prior relationship, Petrakis confirmed that PowerPay and Valley Strong had no prior relationship as of March 1, 2021—the date when Hisler emailed Petrakis and Haas about Valley Strong. (Doc. No. 63-24 at 319.) Smith also testified that March 2021 was the first time he had talked to Petrakis since he left TDECU (Doc. No. 63-25 at 14), and Petrakis emailed Smith the day after their call, writing that "[i]t was a pleasant surprise to be able to catch up yesterday" (Doc. No. 74-25 at 2).

### D.    PowerPay and Seaport's Relationship Sours

Unfortunately, PowerPay and Seaport's relationship soured for several reasons. *First*, on May 19, 2021, the day the contract was set to expire, Hisler sent Haas and Petrakis a proposed Exhibit A, which listed 60 prospective investors and included both American Heritage and Valley Strong. (Doc. No. 63-13 at 2–3.) Haas rejected the proposed list of investors because "[t]his list should include people we've actually discussed an opportunity with." (Doc. No. 63-14 at 2.) The parties never agreed on a list of investors to add to Exhibit A. (Doc. No. 63-20 at 377.)

*Second*, PowerPay breached its contract with Seaport because it did not pay the amount of fees that Seaport was owed. (July 28, 2025 Hr'g Tr. at 24:2–5.) Though American Heritage funded over a hundred million dollars in loans on PowerPay's platform, PowerPay made only a single payment to Seaport for $28,555.24 in May 2021. (Doc. No. 74-1 at 24.) As all agree, this one payment is much less than what Seaport is owed. (*See* Doc. No. 63-23 at 390 (Petrakis estimating that PowerPay owes Seaport roughly $300,000 in fees.)). Seaport and PowerPay attempted to reconcile their "dispute as to fees invoiced/owed to Seaport" in April 2022, but they were unable to do so. (Doc. No. 83-17 at 2.)

*Third*, PowerPay blamed Hisler and Seaport for tanking its relationship with American Heritage.  As Petrakis testified, he believed that Hisler had helped American Heritage negotiate against PowerPay and spoke negatively about PowerPay's proposed insurance carrier to American Heritage.  (Doc. No. 63-23 at 324–25, 329, 332–33.)  Given these issues, it is no surprise that the relationship between the parties deteriorated.

### E.    Seaport Sues PowerPay, and PowerPay Countersues Seaport and Hisler

On April 13, 2023, Seaport sued PowerPay for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment (in the alternative), and for failing to provide proper accounting.  (Doc. No. 1.)  On June 2, 2023, Seaport agreed to voluntarily dismiss its claim for breach of the implied duty of good faith and fair dealing.  (Doc. No. 18.)  On June 23, 2023, PowerPay responded to Seaport's complaint with an answer and counterclaims (Doc. No. 20), and it filed an amended answer and counterclaims on July 14, 2023 (Doc. No. 26).  PowerPay brought counterclaims for (1) breach of contract against Seaport and (2) tortious interference with business relations against Seaport and Michael Hisler.  (*Id.* at 20–24.)

PowerPay now moves for partial summary judgment on Seaport's breach of contract claim.  (Doc. No. 63.)  In its motion, PowerPay seeks summary judgment on two issues:  (1) the proper interpretation of the compensation provision and (2) whether Seaport is entitled to fees for introducing PowerPay to Valley Strong.  (*See* Doc. No. 63-1 at 20–29.)  Seaport opposes the motion and contests both issues.  (Doc. No. 74.)  The Court held oral argument on July 28, 2025.  (Doc. No. 91.)

## II.    Standard of Review

Summary judgment is appropriate when the "materials in the record," show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248.  "[A]t the summary judgment stage the judge's function is not [her]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  And at "summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations and alterations omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted); *see also id.* at 325 ("[T]he burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case.").  After the moving party has met its burden, the nonmoving party is required to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 323 (internal

quotations omitted); *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23 (internal quotations omitted). "[T]his standard makes clear that, even though the right to a jury trial is implicated, a nonmoving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (internal quotations omitted). "[U]nsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010).

## III.    Discussion

PowerPay says its motion is simple:  All the Court must do is read and apply the unambiguous language of the contract to resolve two issues.  First, PowerPay argues that the compensation provision is unambiguous and entitles Seaport to much less in fees than it now seeks.  (Doc. No. 63-1 at 20–27.)  Second, it claims that Seaport cannot earn fees for introducing Valley Strong to PowerPay because Valley Strong is not an approved investor who is listed on Exhibit A of the contract.  (*Id.* at 27–29.)  Seaport disagrees.  It first claims that the compensation

provision is ambiguous and tries to offer its own interpretation of the provision. (Doc. No. 74 at 15–25.) Seaport then argues that Valley Strong did not need to be approved by PowerPay or added to Exhibit A in order for Seaport to be entitled to fees for introducing Valley Strong to PowerPay. (*Id.* at 26–31.)

Because the Court finds that the compensation provision is unambiguous, the Court grants PowerPay's motion for summary judgment on the first issue. But the Court denies PowerPay's motion on the second issue because the Exhibit A requirement is not a condition precedent for Seaport to be entitled to fees under the contract. The Court thus grants in part and denies in part PowerPay's motion for partial summary judgment.

## A.     The Compensation Provision is Unambiguous

The parties first dispute the proper interpretation of the compensation provision. This provision provides:

> Seaport shall be entitled to 50 basis points (the "*Seaport Fee*") on funded Transactions originated by Investors introduced by Seaport to the Company, which shall be earned for the duration of any Loans underlying such Transactions (to the extent of repayment thereon) and paid within 15 days of the end of each calendar quarter.

(Doc. No. 63-3 at 5.)

PowerPay reads this provision to mean that Seaport is entitled to a fee of 0.5% of the original principal balance of qualifying loans, which is earned for the duration of the loans based on the amount of principal repaid by the borrower, and the fee is paid within 15 days of the end of each calendar quarter. (Doc. No. 63-1 at 20–21.) In other words, Seaport is entitled to a fee of 0.5% of the original principal amount of a loan, but this fee is not earned immediately. Rather, Seaport's fee is earned for the life of the loan to the extent that the consumer repays the principal amount of the loan. Seaport reads this provision quite differently. It says that it is entitled to an

annual fee of 0.5% "of the monthly outstanding principal amount of the loans (*i.e.*, the original funded amount less any repayments thereon), earned for the duration of the loans, and paid quarterly."  (Doc. No. 74 at 8.)

To make sense of these competing interpretations, consider the following example:  An investor introduced by Seaport to PowerPay funds a $10,000 loan for a couple to renovate their kitchen on January 1.  On February 1, the couple makes a payment on the loan, which reduces the principal amount by $1,000.  The couple makes no further payments on the loan in the first calendar quarter.[2]  Under PowerPay's interpretation, Seaport would earn $5 for the first calendar quarter because Seaport earns 0.5% on the amount of principal repaid.  The formula to calculate Seaport's fee is straightforward:  Seaport Fee = the amount of principal repaid ($1,000) x 0.005.  By contrast, under Seaport's interpretation, it would earn $11.67 for the first calendar quarter.  Its interpretation requires more math because Seaport earns 50 basis points annually, but its fee is calculated based on the monthly outstanding principal balance of the loan.  So, in this example, Seaport's fee would be calculated under the following formula:  Seaport Fee = (outstanding principal amount for January [$10,000] x 0.005 x 1/12) + (outstanding principal amount for February [$9,000] x 0.005 x 1/12) + (outstanding principal amount for March [$9,000] x 0.005 x 1/12).  As this example shows, when these different methodologies are applied across thousands of loans, it leads to the current multi-million-dollar dispute.

Having put the competing interpretations properly into focus, the Court now evaluates whether the compensation provision is ambiguous.  Under Pennsylvania law, "[c]ontract interpretation is a question of law that requires the court to ascertain and give effect to the intent

---

[2] For purposes of this example, the Court assumes that the loan is not in default even though only one payment was made in the first calendar quarter.

of the contracting parties as embodied in the written agreement." *In re Old Summit Mfg., LLC*, 523 F.3d 134, 137 (3d Cir. 2008) (internal quotations omitted). "When the words are clear and unambiguous, the intent of the parties must be determined from the express language of the agreement." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009) (internal quotations omitted). "A contract's terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Certain Underwriters at Lloyd's London v. Peerstar, LLC*, 649 F. Supp. 3d 73, 78 (E.D. Pa. 2023). But a court cannot "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999). And "[t]he mere fact that the parties do not agree on the proper construction does not make a contract ambiguous." *Pacific Employers Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 426 (3d Cir. 2012).

The plain meaning rule is the "most important rule to apply in contract interpretation." *EMC Outdoor, LLC v. Stuart*, No. CV 17-5172, 2021 WL 1224064, at *3 (E.D. Pa. Mar. 31, 2021). Under it, the Court "assumes that the intent of the parties to an instrument is embodied in the writing itself." *Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 680 (E.D. Pa. 2014) (internal quotations omitted). And "[b]ecause 'the law does not assume that the language of the contract was chosen carelessly,' that language is of paramount importance." *Pacific Employers Ins. Co.*, 693 F.3d at 426 (quoting *Meeting House Lane, Ltd. v. Melso,* 628 A.2d 854, 857 (Pa. Super. Ct. 1993)). Thus, when the express language of the contract is clear, the language "speaks for itself and a meaning cannot be given to it other than that expressed." *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982) (internal quotations omitted).

11

Here, the plain meaning rule starts and ends the analysis. The plain language of the compensation provision supports only one objectively reasonable interpretation—PowerPay's. Recall that PowerPay does not itself fund the home consumer loans on its online lending platform. (Doc. No. 74-1 at 3.) Instead, PowerPay relies on investors to "finance" these home improvement loans (*id.*), which is why PowerPay retained Seaport as an "introducing agent" in the first place (Doc. No. 63-3 at 2). From a 50,000-foot view, the compensation provision entitles Seaport to a fee when an investor it has introduced to PowerPay funds a loan on PowerPay's platform. At a more granular level, the compensation provision contains three clauses:

> *Clause One*:  Seaport shall be entitled to 50 basis points (the "*Seaport Fee*") on funded Transactions originated by Investors introduced by Seaport to [PowerPay],
>
> *Clause Two*:  which shall be earned for the duration of any Loans underlying such Transactions (to the extent of repayment thereon)
>
> *Clause Three*:  and paid within 15 days of the end of each calendar quarter.

(Doc. No. 63-3 at 5.) As explained below, clause one establishes what Seaport's fee is, clause two explains how its fee is earned, and clause three explains how its fee is paid. The Court addresses each clause in turn.

*Clause One:  What Is Seaport's Fee?*  The meaning of clause one is clear and unambiguous, and neither party truly contests it. Both parties agree that 50 basis points means 0.5%. (Doc. Nos. 63-1 at 8; 63-21 at 67.) They also agree that Seaport is entitled to a fee only for loans "originated by Investors introduced by Seaport to the Company." (Doc. No. 63-3 at 5.) In other words, the only loans that qualify for Seaport's fee are those made by an investor introduced to PowerPay by Seaport. The Court will refer to these loans as "qualifying loans."

Given the agreement between the parties on these two parts of clause one, the only remaining interpretive question in clause one is the meaning of "funded Transactions."

Clause one specifies that Seaport is entitled to 50 basis points (or 0.5%) on "funded Transactions." (Doc. No. 63-3 at 5.) Because Seaport earns a percentage of "funded Transactions," this term must be able to be expressed as a numerical amount. Under the contract, a "Transaction" occurs when an investor "acquir[es]" loans on PowerPay's platform "on a servicing retained basis," so a "funded Transaction" refers to when an investor funds loans on PowerPay's platform. (*Id.* at 2.) Though Seaport contested the meaning of "funded Transaction" in its brief (*see* Doc. No. 74 at 17), Seaport's counsel conceded at oral argument that "funded Transaction" means "the amount that was funded at the closing table." (July 28, 2025 Hr'g Tr. at 85:9–13.) This concession is eminently reasonable and aligns with PowerPay's interpretation. (*Id.* at 85:17–19.) If "funded Transaction" refers to when an investor funds loans on PowerPay's platform, then the amount of a "funded Transaction" is the amount of money that the investor has funded in connection with each loan on PowerPay's platform. Because an investor funds the full amount of each loan up front, the funded amount of a loan is its original principal balance. Thus, clause one establishes that Seaport is entitled to a fee of 0.5% of the original principal balance of qualifying loans.

*Clause Two: How is Seaport's Fee Earned?* The parties sharply dispute the meaning of clause two. Yet clause two, like clause one, is unambiguous. Though Seaport is entitled to 0.5% of the original principal balance of each loan, Seaport does not earn its fee right away. Instead, clause two establishes that Seaport earns its fee "for the duration of any Loans underlying such Transactions (to the extent of repayment thereon)." (Doc. No. 63-3 at 5.)

The Court begins again where the parties agree.  Both parties agree that "for the duration of any Loans underlying such Transactions" means for the life of the qualifying loan.  (Doc. No. 74-1 at 10.)  If the compensation provision ended there, however, neither the parties nor the Court would be able to discern *how* Seaport earns its fee for the duration of the qualifying loans. Fortunately, the final part of clause two supplies the missing *how*:  Seaport earns its fee during the life of the qualifying loan "*to the extent of repayment thereon*."  (Doc. No. 63-3 at 5 (emphasis added).)  The ordinary meaning of the phrase "to the extent" means "to a particular degree" or "amount."  *See In re Menell*, 160 B.R. 524, 526 (Bankr. D.N.J. 1993) ("The ordinary meaning of the phrase 'to the extent' is the 'amount, or degree to which a thing extends' or the 'scope' or 'limits' to which something applies."  (citing *Webster's New World Dictionary* 217 (1979))); *cf. To the Extent That* (def. 1), *Cambridge Dictionary* (last visited July 28, 2025), https://dictionary.cambridge.org/us/dictionary/english/to-the-extent-that.  The plain meaning of "to the extent of repayment thereon" is thus the amount of repayment on qualifying loans.

Yet not all payments on qualifying loans count towards Seaport's fee.  Recall that clause one established that Seaport is entitled to a fee of 0.5% of the original *principal* balance of qualifying loans.  Because Seaport is entitled to a percentage of the original principal balance of the loan, it follows that Seaport earns its fee when the borrower repays the principal balance of the loan.  So, for example, Seaport would not earn a fee when a consumer makes a payment on just the interest of the loan.  Instead, Seaport earns its fee when the consumer repays the principal of the loan because it is entitled to 0.5% of the original principal amount of the loan. This reading harmonizes clauses one and two and sets forth a clear compensation structure: Seaport is entitled to 0.5% of the original principal balance of a qualifying loan.  Seaport's fee is not earned immediately after the loan is funded, but rather its fee is earned over the life of the

loan (to the extent of repayment thereon, *i.e.*, to the extent of repayment on the loan's original principal balance). In short, part two explains that Seaport's fee is earned for the life of qualifying loans to the extent of repayment on the loan's original principal balance.

*Clause Three: When Is Seaport's Fee Paid?* There is no dispute on the meaning of clause three. All agree that clause three merely specifies that PowerPay must pay the fee that Seaport has earned within 15 days of the end of each calendar quarter. Thus, just as the first two clauses of the compensation provision are clear and unambiguous, so too is the third clause.

Together, these three clauses confirm that PowerPay has the only objectively reasonable interpretation of the compensation provision. Based on the plain meaning of the words used, the Court finds that the compensation provision means that Seaport is entitled to a fee of 0.5% of the original principal amount of qualifying loans, which is earned for the life of the loans based on the amount of principal repaid, and this fee is paid within 15 days of the end of each calendar quarter. This interpretation gives meaning to each word of the compensation provision, does not "conflict with the accepted and plain meaning of the language used," and allows the express language to "speak[ ] for itself." *Steuart*, 444 A.2d at 661–62 (cleaned up).

In an effort to resist the plain language rule, Seaport argues that summary judgment must be denied because it "can offer an alternative interpretation that is . . . reasonable." (Doc. No. 74 at 24.) The Court disagrees. Recall that under Seaport's interpretation, it is entitled to 0.5% "of the monthly outstanding principal amount of the loans (*i.e.*, the original funded amount less any repayments thereon), earned for the duration of the loans, and paid quarterly." (*Id.* at 8.) Seaport does not earn 0.5% on the outstanding principal amount of qualifying loans each month, but rather it earns this fee each "year." (Doc. No. 63-20 at 48.) Seaport's interpretation can thus be restated as follows: Seaport is entitled to a yearly fee of 0.5% that is calculated each month

based on the outstanding principal amount of qualifying loans. Seaport earns this fee for the duration of the qualifying loans, and Seaport's fee is paid quarterly. As explained below, the Court discerns three fatal issues with Seaport's interpretation.

*First*, in its brief, Seaport argued that "funded Transactions" refers not to the *original* principal balance of the loans, but to the *outstanding* principal balance of the loans. (*Id.* at 24.) This interpretation goes beyond the bounds of reasonableness. While a "funded Transaction" could naturally be read to mean the amount of money funded in connection with a loan (the original principal balance), it could not be read to mean the amount of money that has been funded but not yet repaid. The funded amount of each loan is fixed and does not change based on the amount of repayment. Indeed, "funded" simply means "to provide funds for." *Fund* (def. 1b), *Merriam-Webster Dictionary* (last visited July 29, 2025), https://www.merriam-webster.com/dictionary/fund. The plain meaning of the word "funded" thus forecloses Seaport's claim that the term in fact means the amount of money funded but not yet repaid. Because the Court cannot construe a contract "in conflict with . . . the accepted and plain meaning of the language used," the Court finds that Seaport's interpretation of "funded Transactions" is not objectively reasonable.[3]  *Steuart*, 444 A.2d at 662 (internal quotations omitted).

*Second*, for Seaport's interpretation to make sense, the Court would have to pick up a pen and insert the word "yearly" into clause one and "monthly" into clause two. Even if the Court agreed that "funded Transactions" could mean the *outstanding* principal amount of the loan, the compensation provision would still not support Seaport's interpretation. In this hypothetical,

---

[3] In any event, Seaport's counsel retreated from this interpretation at oral argument. He conceded that "funded Transactions" means "the amount that was funded at the closing table," and he confirmed that PowerPay and Seaport "are in agreement" on the meaning of "funded Transactions." (July 28, 2025 Hr'g Tr. at 85:9–19.)

Seaport is entitled to 0.5% of the outstanding principal amount of qualifying loans, which is earned for the life of the loans (to the extent of repayment thereon).  Under Seaport's reading, however, the compensation provision is left with two gaping holes: (a) The compensation provision is silent as to how often Seaport earns 50 basis points on the outstanding principal balance of the qualifying loans, and (b) nothing in the compensation provision specifies how often the outstanding principal balance of the qualifying loans would be calculated.

On the former issue, Seaport's interpretation makes sense only if it is entitled to a *yearly* fee of 50 basis points.  The key issue here is that the compensation provision does not say that Seaport is entitled to a yearly fee, it says that Seaport is entitled to 50 basis points on "funded Transactions."  (Doc. No. 63-3 at 5.)  Without a term that establishes the frequency in which Seaport earns 0.5% of the outstanding principal balance of qualifying loans, the fee could theoretically be earned in full every day, month, or year.  And on the latter issue, without a word or phrase (like "monthly"), neither the parties nor the Court would be able to discern how often the outstanding principal amount is to be calculated.  Indeed, this amount could change every hour of every day as consumers repay their loans.  The Court would thus have to add a term, like "monthly", to establish when the outstanding principal balance is to be calculated.

As written, the language in clause two cannot support an interpretation where Seaport is entitled to a yearly fee of 50 basis points, which is calculated based on the monthly outstanding balance of the loans.  Instead, Seaport's interpretation works only if the Court inserts the words "yearly" into clause one and "monthly" into clause two.  But "[i]t is not the province of the court to alter a contract by construction or to make a new contract for the parties; its duty is confined to the interpretation of the one which they have made for themselves, without regard to its wisdom or folly."  *Steuart*, 444 A.2d at 662 (internal quotations omitted); *see also Delaware*

17

*County v. Delaware County Prison Emp. Indep. Union*, 713 A.2d 1135, 1138 (Pa. 1998) ("It is

not proper, under the guise of construction, to alter the terms to which the parties, whether in

wisdom or folly, expressly agreed."). And "[f]or the court to read the contract" as Seaport

requests, the Court would be required to "add to the terms of the contract that is not on its face

ambiguous," which would violate "the parol evidence rule." *Reynolds Packaging KAMA, Inc. v.*

*Inline Plastics Corp.,* No. Civ. A. 08-1902, 2010 WL 1024734, at *4 (M.D. Pa. Mar. 17, 2010)

(internal quotations omitted). Thus, the omission of the words "yearly" and "monthly" is another

fatal blow to Seaport's interpretation.

  *Third*, Seaport argues that the phrase "to the extent of repayment thereon" can mean "the

original funded amount of the [qualifying loans] less the amount that has been repaid, or net of

the amounts repaid." (Doc. No. 74 at 24.) In other words, Seaport's interpretation would change

"to the extent of repayment" to "net of repayment." This reading is unreasonable because it runs

afoul of the plain meaning of the phrase "to the extent of repayment." As explained earlier, the

plain meaning of "to the extent of repayment thereon" is the amount of repayment. Under

Seaport's interpretation, "to the extent of repayment" does not mean the amount of repayment,

but it means the exact opposite: the amount of principal not yet repaid. (*See* Doc. No. 74 at 24.)

Because Seaport's interpretation "contradict[s] the standard meaning" of "to the extent of

repayment," it is not a reasonable alternative meaning of the phrase. *Bohler-Uddeholm Am.,*

*Inc.*, 247 F.3d at 96. Plus, if Seaport wished to "convey this contradictory meaning," it could

have "easily used another term"—the word "net." *Id.*; *see also Wert v. Manorcare of Carlisle PA,*

*LLC*, 124 A.3d 1248, 1261 (Pa. 2015) ("We decline to read an ambiguity into an agreement that

could easily have been addressed by [the parties] within its express terms.").

Seaport's failure to offer an objectively reasonable alternative interpretation warrants summary judgment for PowerPay because a "contract is ambiguous 'if, and only if, it is reasonably or fairly susceptible of different constructions.'"  *Citizen Dev., LLC v. Sys. Soft Techs., Inc.*, No. 1:23-CV-00564, 2025 WL 1372837, at *7 (M.D. Pa. May 12, 2025) (quoting *Capricorn Power Co., Inc. v. Siemens Westinghouse Power Corp.*, 324 F. Supp. 2d 731, 749 (W.D. Pa. 2004)).  Of the two interpretations presented, the compensation provision is susceptible to only one objectively reasonable interpretation—PowerPay's.  Unlike Seaport's interpretation, PowerPay's interpretation gives meaning to each word in the compensation provision and does not require the Court to add words or to adopt an interpretation that "conflict[s] with the accepted and plain meaning of the language used."  *Steuart*, 444 A.2d at 662 (cleaned up).  Because PowerPay offers the only objectively reasonable interpretation of the compensation provision, summary judgment is appropriate.  *See Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 163–64 (3d Cir. 2001) ("The court can grant summary judgment on an issue of contract interpretation if the contractual language being interpreted is subject to only one reasonable interpretation."  (internal quotations omitted)).

Still, for the sake of thoroughness, the Court addresses Seaport's invitation for the Court to review the extrinsic evidence to determine whether the compensation provision is ambiguous.[4] (Doc. No. 74 at 25–26.)  At the outset, because the parties' contract contains an integration clause, the Court finds that it is a fully integrated contract.  *See SodexoMAGIC, LLC v. Drexel*

---

[4] In its brief in opposition, Seaport argued that because PowerPay cited extrinsic evidence, it has tacitly conceded that the provision is ambiguous.  (Doc. No. 74 at 20–22.)  Even if the Court were to find that PowerPay did rely on extrinsic evidence (a dubious proposition), it would not change the Court's analysis because the Court did not rely on extrinsic evidence to find that the compensation provision is unambiguous.

*Univ.*, 24 F.4th 183, 213 (3d Cir. 2022) ("To demonstrate integration, parties commonly include an integration clause in a contract.").  As such, the parol evidence rule applies:

> Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement.  All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract . . . and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence.

*Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436 (Pa. 2004) (internal quotations omitted).

Notwithstanding the parol evidence rule, a court may consider extrinsic evidence under Pennsylvania law to determine whether the contract contains a latent ambiguity.  *Connelly Constr. Corp. v. Travelers Cas. & Sur. Co. of Am.*, No. CV 16-555, 2018 WL 2091417, at *4 (E.D. Pa. May 3, 2018); *see also Metzger v. Clifford Realty Corp.*, 476 A.2d 1, 5 n.2 (Pa. Super. 1984) ("It is only in the case of latent ambiguity that the court is permitted to go *outside the writing* to make the *initial* determination of whether an ambiguity exists.").  Typically, a "a latent ambiguity arises" when "a writing refers to a particular person or thing and is thus apparently clear on its face, but upon application to external objects is found to fit two or more of them equally."  *Metzger*, 476 A.2d at 5 n.2 (internal quotations omitted).  "[I]f a party believes that a contract contains a latent ambiguity justifying the use of extrinsic evidence, the party must cite a 'contractual hook'—that is, 'the proffered extrinsic evidence must support an alternative meaning of a specific term or terms contained in the contract, rather than simply support a general claim that the parties meant something other than what the contract says on its face.'"  *Connelly Constr. Corp.*, 2018 WL 2091417, at *4 (quoting *Bohler–Uddeholm*, 247 F.3d at 96).

Here, Seaport does not properly invoke the latent ambiguity doctrine. For one, Seaport

cites no "collateral facts which make the meaning of the contract uncertain." *Samuel Rappaport*

*Fam. P'ship v. Meridian Bank*, 657 A.2d 17, 22 (Pa. Super. Ct. 1995) (internal quotations

omitted). This is not a case where the contract refers to a hay house and there are two possible

hay houses or where a contract refers to "$10,000" but does not specify American or Canadian

dollars. *See Metzger*, 476 A.2d at 5 n.2 (the hay house example); *Duquesne Light Co. v.*

*Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995) (the $10,000 example). Instead,

Seaport asks the Court to consider extrinsic evidence because "the parties [allegedly] intended

something different that was not incorporated into the contract." *Bohler-Uddeholm*, 247 F.3d at

93. Put otherwise, what Seaport "is attempting to do is to create an ambiguity in this otherwise

unambiguous contract using parol evidence, which is barred by the parol evidence rule." *DRPA*

*v. Thornburgh*, 585 A.2d 1123, 1126 (Pa. Commw. Ct. 1989).

For another, Seaport cannot cite any contractual hook that would justify the use of

extrinsic evidence. Seaport's sole attempt to do so is its proposed interpretation of the phrase "to

the extent of repayment thereon." Yet to manufacture an ambiguity, Seaport "distort[s]" the

phrase to mean the "net of repayment," *i.e.*, the amount of *unpaid* principal. *Bohler-Uddeholm*,

247 F.3d at 93. Because a proposed alternative meaning "must be reasonable," the Court finds

that Seaport's contractual hook is a nonstarter and fails to show a latent ambiguity in the

contract. *Id.* The Court thus declines to resort to extrinsic evidence because the compensation

provision is unambiguous on its face, its plain meaning supports only one reasonable

interpretation, and Seaport has not identified any ambiguous words or phrases in the

compensation provision, which would open the door to the extrinsic evidence.[5]  *See Foster v. Attias*, No. CV 18-4853, 2023 WL 3435463, at *12 (E.D. Pa. May 12, 2023) ("[E]xtrinsic evidence is admissible only to resolve the particular, narrowly-defined ambiguity or obvious omission.").

* * *

In sum, the compensation provision is not ambiguous.  The provision contains three clauses that explain (1) Seaport is entitled to a fee of 0.5% of the original principal balance of qualifying loans; (2) this fee is earned for the life of the qualifying loans to the extent of repayment on the original principal balance of qualifying loans; and (3) this fee is paid out within 15 days of the end of each calendar quarter.  Because "the contractual language being interpreted is subject to only one reasonable interpretation," the Court grants PowerPay's motion for partial summary judgment on this issue of contract interpretation.  *Emerson Radio Corp.*, 253 F.3d at 163–64 (internal quotations omitted).

### B.    Seaport Could Earn Fees Even Though Valley Strong Was Not Listed on Exhibit A

Like the compensation provision, the parties sharply dispute the meaning of the non-circumvention provision.  In relevant part, this provision provides:

---

[5] Nor does the Court find that it can ignore the clear and unambiguous language of the compensation provision because PowerPay made a single payment to Seaport, which was "within spitting distance" of the amount of fees that Seaport thought it was owed under its interpretation.  (Doc. No. 63-20 at 98.)  Indeed, Seaport merely "attempts to use" PowerPay's one payment under the contract "to claim that the parties meant something other" what the compensation provision "says on its face."  *Lydon Millwright Servs., Inc. v. Ernest Bock & Sons, Inc.*, No. CIV.A. 11-7009, 2013 WL 1890355, at *5 (E.D. Pa. May 7, 2013).  Under these circumstances, "*Bohler–Uddeholm* precludes the Court from considering [Seaport's] extrinsic evidence in order to ignore the plain language of the" compensation provision.  *Id.*

> Notwithstanding the foregoing, this Agreement shall not apply to those Investors that the Company has a prior relationship with unless agreed to by [PowerPay]. Seaport shall provide [PowerPay] with the name of any Investor prior to releasing specifics regarding a Transaction. The approved Investors will be included on Exhibit A to this agreement, and will be updated from time to time.

(Doc. No. 63-3 at 3.) PowerPay reads this part of the contract to mean that investors "must be approved" and "placed on Exhibit A, which resolves any dispute as to which [i]nvestors are covered by the [a]greement." (Doc. No. 63-1 at 29.) Unsurprisingly, Seaport reads the contract differently. It says that this provision does not require PowerPay's approval of every investor, nor does the contract limit its fee to only approved investors identified on Exhibit A. (Doc. No. 74 at 27.) The Court agrees with Seaport.

In its motion, PowerPay argues that it need not pay Seaport fees for introducing Valley Strong because (1) PowerPay did not agree that Valley Strong was an "approved investor" and (2) Valley Strong was not added to Exhibit A. (Doc. No. 63-1 at 27–29.) Neither ground persuades. To start, PowerPay advances a strained interpretation of the non-circumvention clause to claim that the contract requires PowerPay to "approve[ ]" all investors. (Doc. No. 88 at 13.) The contract does not say that PowerPay must "approve[ ]" all investors, it says that "approved investors will be included on Exhibit A." (Doc. No. 63-3 at 3.) This is a meaningful distinction because PowerPay's interpretation would add an unwritten requirement to the contract that PowerPay must first approve each investor before Seaport is entitled to a fee for introducing PowerPay to that investor. Yet the only place in the contract where PowerPay's "approval" of an investor is explicitly considered is when PowerPay and the prospective investor have a prior relationship. (*See generally id.*) The Court thus agrees with Seaport that PowerPay's approval of an investor was not required for Seaport to be entitled to fees under the contract.

Nor is the Court persuaded that Seaport's compliance with the "Exhibit A" requirement was a condition precedent for Seaport to be entitled to fees under the contract. Under Pennsylvania law, "[w]hile the parties to a contract need not utilize *any* particular words to create a condition precedent, an act or event designated in a contract will not be construed as constituting one unless that clearly appears to have been the parties' intention." *Acme Markets, Inc. v. Fed. Armored Exp., Inc.*, 648 A.2d 1218, 1220 (Pa. Super. Ct. 1994). Given this rule, the Third Circuit has said that "a condition precedent must be expressed in clear language or it will be construed as a promise." *Castle v. Cohen*, 840 F.2d 173, 177 (3d Cir. 1988).

Recall that the non-circumvention clause says that "[t]he approved Investors will be included on Exhibit A to this agreement, and will be updated from time to time." (Doc. No. 63-3 at 3.) Yet the compensation provision does not limit Seaport's fee to loans funded by "approved Investors," it states that Seaport is entitled to a fee on loans funded by "*Investors*." (*Id.* at 5 (emphasis added).) Thus, what is missing from the contract is language that ties or limits Seaport's fee to the approved Investors listed on Exhibit A. Take, for example, the Third Circuit's decision in *Cato Cap. LLC v. Hemispherx Biopharma Inc*., 625 F. App'x 108, 111 (3d Cir. 2015). There, as here, two companies—Cato and Hemispherx—entered a contract whereby Cato would identify prospective investors for Hemispherx, and Cato would earn a fee if an investor it identified did business with Hemispherx. *Id.* at 109. Under the contract, Cato was required to "designate in writing" a list of all its prospects at the end of the contract, and Cato would earn fees only "for Transactions . . . completed with any of the *listed*" prospects. *Id.* at 109–10 (emphasis added). The Third Circuit held that "[t]his language unambiguously conditions payment . . . on Cato's submission of a list of" prospects at the end of the contract. *Id.* at 111. By contrast, here, the contract does not expressly limit Seaport's fee to the approved

Investors listed on Exhibit A.[6]  Without more, the Court cannot find as a matter of law that PowerPay need not pay Seaport for introducing Valley Strong solely because Valley Strong is not listed on Exhibit A.  *See Castle*, 840 F.2d at 177 (interpreting a requirement in a contract as a promise, not a condition precedent and highlighting that condition precedents are "disfavored").  The Court thus denies PowerPay's motion for partial summary judgment on this issue.[7]

## IV.    Conclusion

In short, PowerPay is correct that the compensation provision is unambiguous.  Yet PowerPay is incorrect that it did not need to pay Seaport for introducing Valley Strong solely because Valley Strong was not listed as an approved investor on Exhibit A.  The Court thus grants in part and denies in part PowerPay's motion for partial summary judgment.

---

[6] PowerPay seems to tacitly concede this point.  It does not dispute that it owes fees to Seaport for introducing American Heritage even though it is undisputed that the parties never agreed on an Exhibit A that listed American Heritage as an approved investor.  (Doc. Nos. 63-20 at 377; 63-23 at 283.)

[7] Though PowerPay asserts that it had a "prior relationship" with Valley Strong, PowerPay's counsel confirmed at oral argument that the Court need not decide this issue to resolve its motion for partial summary judgment.  (July 28, 2025 Hr'g Tr. at 65:16–66:3.)  The Court thus reserves ruling on whether Valley Strong and PowerPay had a prior relationship until trial.  That said, the Court notes that Seaport appears to have the stronger reading of the prior-relationship exception.  This exception states that "this Agreement shall not apply to those Investors that *the Company has a prior relationship with* unless agreed to by the Company."  (Doc. No. 63-3 at 3 (emphasis added).)  The Court tends to agree with Seaport that the plain meaning of the exception embraces only investors who have a prior relationship with PowerPay.  And as all agree, PowerPay *did not* have a prior relationship with Valley Strong in March 2021—when Hisler arranged a call between Petrakis, Haas, Ambrosini, and Smith.  (July 28, 2025 Hr'g Tr. at 62:20–23; Doc. No. 63-24 at 319.)  Still, the Court reserves judgment on this issue until trial.