**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SEAPORT GLOBAL HOLDINGS, LLC**, | **CIVIL ACTION** |
| Plaintiff, Counterclaim-Defendant, | |
| *v.* | **NO. 23-1422-KSM** |
| **POWERPAY, LLC**, | |
| Defendant, Counter-Claim Plaintiff, | |
| *v.* | |
| **MICHAEL HISLER**, | |
| Counter-Claim Defendant. | |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                            **August 2, 2025**

"It's not personal, Sonny.  It's strictly business." *The Godfather* (1972).  Michael

Corleone's iconic line rings just as untrue today as it did over half a century ago.  Business is

often personal, and when a business deal goes south, personal relationships are caught in the

crosshairs.  This case is a good example.  Seaport Global Holdings, LLC ("Seaport") sued

PowerPay, LLC ("PowerPay") to recover unpaid fees under the parties' contract.  (Doc. No. 1.)

In response, PowerPay countersued not only Seaport, but also Seaport's employee, Michael

Hisler.  (Doc. No. 26.)  Seaport and Hisler now move for summary judgment on PowerPay's

counterclaims for tortious interference with contractual relations and for breach of contract.

(Doc. No. 65.)  PowerPay opposes the motion.  (Doc. No. 83.)  For the reasons below, the Court

grants Seaport and Hisler's motion for summary judgment on PowerPay's counterclaim for

tortious interference, but the Court denies Seaport's motion for summary judgment on PowerPay's counterclaim for breach of contract.

# I.    Background

## A.    PowerPay Retains Seaport to Find Investors to Fund Loans on its Platform

In 2018, Michael Petrakis and David Haas co-founded a company called PowerPay. (Doc. No. 63-24 at 28–29.[1])  PowerPay is a financial technology ("Fintech") company that operates an online platform where consumers can apply for and obtain loans for home improvement projects.  (Doc. No. 74-1 at 3.)  Though PowerPay operates an online lending platform, it does not itself fund the loans offered on its platform.  (*Id.*)  Instead, it contracts with investors—mostly credit unions—to do so.  (*Id.*)  Because PowerPay relies on investors to fund the loans on its platform, PowerPay retains "introducing agent[s]" to connect it to prospective investors.  (*See, e.g.*, Doc. No. 74-4.)

In April 2020, PowerPay entered negotiations with Seaport and its employee, Mike Hisler, to retain them as an introducing agent.  (*See* Doc. No. 74-5.)  Seaport is a capital markets and investment banking firm with offices around the world, and Hisler is a financial professional and investment banker with decades of experience.  (Doc. No. 74-1 at 2.)  Petrakis knew Hisler from his employment prior to Seaport.  (Doc. No. 63-21 at 88–89.)  After weeks of negotiations and with the assistance of counsel, PowerPay and Seaport signed a contract on May 19, 2020. (Doc. No. 63-3.)

Pursuant to the contract, Seaport would act "solely in the capacity as the introducing agent for" PowerPay.  (*Id.* at 2.)  As an introducing agent, Seaport's role was "limited" to

---

[1] PowerPay did not file full-page deposition transcripts on the docket.  (*See* Doc. Nos. 63-20–25; 83-22–28.)  So the Court directed PowerPay to email reformatted, full-page deposition transcripts to Chambers.  Unless specified otherwise, the Court cites to these transcripts using the pagination of the full-page transcripts.

"introducing" PowerPay to prospective investors and "supplying" such investors with certain information from PowerPay. (*Id.*) Put otherwise, Seaport would act "merely as a conduit of information" between prospective investors and PowerPay. (*Id.*) In keeping with this limited role, Seaport agreed to "make no representations or warranties to any Investor or [PowerPay] regarding any Transaction, the information to be supplied by [PowerPay] or [the] Investor, the past, present or future performance of the collateral which might secure any Transaction, the documentation evidencing the Transaction, the suitability of any Transaction as an investment, and any matter whatsoever which relates to any Transaction." (*Id.* at 3.) Seaport also promised to devote its "commercially reasonable efforts and such time as reasonably required . . . to perform its duties [under the contract] so as to advance the interests of" PowerPay. (*Id.*) In exchange for these efforts, Seaport would earn a fee when an investor it introduced to PowerPay funded loans on its platform. (*Id.* at 5.)

### B.    Seaport Introduces American Heritage to PowerPay

After the parties signed the agreement in spring 2020, Hisler introduced Petrakis to Brian Schmitt, the Chief Financial Officer of American Heritage Federal Credit Union ("American Heritage"). (Doc. No. 83-1 at 23.) Following this introduction, American Heritage and PowerPay signed a lender agreement, which governed how American Heritage would fund loans on PowerPay's platform. (Doc. No. 83-4 at 2.)

Under the terms of the lender agreement, PowerPay was required "to maintain . . . an insurance policy protecting [American Heritage] in the event of a default under any of the loans originated via the Platform." (*Id.* at 8.) To satisfy its contractual obligation, PowerPay agreed to "administer and manage the Protequity Home Equity Loan Insurance program to ensure default coverage for" American Heritage's loans. (*Id.* at 2.) Subject to American Heritage's "consent,"

3

however, PowerPay could "substitute the [Protequity Insurance] Policy at any time with a credit default insurance policy that include[d] the same or better policy limitations as set forth in the Policy." (*Id.* at 23.)

The lender agreement had an initial term of three years. (*Id.* at 10.) After the initial term expired, the contract would "automatically renew each year for an additional term of twelve (12) months unless terminated by either party by means of written notice provided at least thirty (30) calendar days prior to the end of any term." (*Id.*) Despite these term provisions, American Heritage could terminate the agreement "for convenience, upon ninety (90) days' notice to" PowerPay. (*Id.*) American Heritage could also stop funding new loans "without terminating the servicing" of existing loans if it gave PowerPay 90 days' notice. (*Id.*) With the lender agreement in place, American Heritage began funding loans on PowerPay's platform around December 2020. (Doc. No. 83-1 at 6.)

C.    **American Heritage Retains Seaport to Sell its Loans on the Secondary Market**

On May 27, 2021, American Heritage retained Seaport as a "non-exclusive broker." (Doc. No. 69-6 at 3.) In this role, Seaport would introduce American Heritage to potential purchasers of its "unsecured home improvement loans," which included the loans that American Heritage had funded on PowerPay's platform. (*Id.* at 3, 10; Doc. No. 74-24 at 34.) If Seaport introduced a purchaser who bought loans that American Heritage had funded, Seaport earned "twenty five basis points (0.25%) multiplied by the aggregate unpaid principal balance" on those loans. (Doc. No. 69-6. at 5.) Legally, American Heritage was required to keep at least 10% of its funded loans on its own books, so it could sell only 90% of its loans. (Doc. No. 83-24 at 46.) These sales, often called "loan participation," helped American Heritage "diversify . . . risk," "expand [its] geographic reach," and increase its overall loan volume. (*Id.* at 46–47.) Given

4

these benefits, "loan participation was an important part of American Heritage's lending strategy and business plan." (Doc. No. 86-1 at 6.)

### D.    American Heritage Declines PowerPay's AQI Insurance Proposal

Pursuant to PowerPay's obligations under the lender agreement with American Heritage, it first obtained default insurance for American Heritage's loans through Trisura. (Doc. No. 83-1 at 8.) But in August 2021, Trisura was exiting the direct insurance market, so PowerPay proposed a replacement insurance provider, American Quarter Insurance ("AQI"). (Doc. Nos. 86-1 at 8; 83-7 at 4.) AQI is an insurance company based out of the Cayman Islands that was created by PowerPay's owners, Petrakis and Haas, to insure loans on PowerPay's platform. (Doc. No. 83-1 at 8.)

On August 19, 2021, Haas emailed Schmitt a term sheet that included PowerPay's request for American Heritage to agree to insurance coverage through AQI. (Doc. No. 83-7 at 4.) On the same term sheet, it also listed as an economic term "reserve amount," which was defined as "1.5% of all collected loan payments." (*Id.*) Four days later, American Heritage and PowerPay discussed a "reserve approach" as an alternative to the AQI insurance proposal. (Doc. No. 83-24 at 202–205.) Under the reserve approach, instead of paying premiums to an insurance provider, PowerPay would create a financial fund to cover any noncompliant or nonperforming loans. (*Id.* at 203.) PowerPay would serve as a claim administrator of the reserve fund and process repurchase payments under a claim process that mirrored Trisura's. (*Id.* at 203–04.)

On August 26, 2021, Schmitt looped in Hisler on American Heritage and PowerPay's insurance negotiations by forwarding him a "Funding and Feasibility Study" of PowerPay. (Doc. No. 83-8 at 2–3.) Schmitt emailed Hisler because the insurance coverage on these loans would impact investors' willingness to purchase the participations that American Heritage was

selling.  (Doc. No. 83-25 at 152.)  And this information was relevant to Hisler because he (and Seaport) had been retained to sell American Heritage's loans on the secondary market.  (Doc. No. 69-6 at 3.)

Later that same day, Hisler sent two emails back to Schmitt.  In his first email, he sent a chart of Federal Reserve charge-off rates from 2000 to 2021.  (Doc. No. 83-9 at 2–3.)  In his second email, Hisler wrote to Schmitt that "I wouldn't agree to anything currently just say 'we'll think about it.'"  (Doc. No. 83-10 at 2.)  He then raised four points for Schmitt to consider:

1) Find out what they are charging you currently for 0–10% Trisura insurance on the existing flow - this is a key anchor number to know to negotiate new deal.

2) For the new rate - a function of:

   a. 0–1.5% reserve and their counterparty risk - if reserve is in 3rd party trust acct like WSFS etc. then sounds like that takes care of counterparty risk and just have to focus on pricing.

      i. Ask about their Captive Insurance company timing that will be A rated like Trisura

   b. if you straightline the risk (I would say that anything 0–3% is worth more than 3–10% given historical charge-offs):

      i. Straightline - For example: if the answer to 1) = l00bps each 0–1% is worth 10bps

      ii. 0–3% more weighting: something greater than 10bps per 0–1% slice given this example

3) Weigh against what any potential competitor [credit union] would accept i.e. some may not care at all about insurance in any form and get more flow because of

4) Federal Reserve Charge-off rates: All banks last 20yrs for unsecured non-credit card consumer loans and all FICOs: about 1.5% currently and peaked 2.5% in 2009[.]

6

(*Id.*)  During his deposition, Hisler explained that he sent this email to "help [Schmitt] negotiate because he asked for that help."  (Doc. No. 83-22 at 307.)  On August 31, 2021, Schmitt sent Hisler a chart comparing an insured program versus a reserve program.  (Doc. No. 83-11 at 2–3.)

On September 14, 2021, Petrakis emailed Schmitt an AQI policy template.  (Doc. No. 69-8 at 2, 4–31.)  Schmitt replied one week later and expressed his concern about the AQI proposal because American Heritage is "not too keen when one company controls the underwriting and insurance."  (*Id.* at 2.)  Schmitt continued that American Heritage had "seen too many instances where it does not end up well" and expressed his preference for "either a situation where there is a tenured, third party insurance company (like what we have with Trisura) or the reserve method where losses could be applied."  (*Id.*)  Around this same time, Schmitt and Hisler further discussed the AQI insurance proposal and had a conversation about American Heritage's loans being "unsaleable" on the secondary market if American Heritage agreed to the AQI insurance proposal.  (Doc. No. 83-25 at 151–53.)

The negotiations between PowerPay and American Heritage made little headway over the next month.  This deadlock became a serious problem because the insurance policy for American Heritage's loan was set to expire on October 14, 2021, and without insurance coverage, American Heritage was "shutting down" the program.  (Doc. No. 83-12 at 2.)  The day before the insurance coverage lapsed, PowerPay obtained an extension of the Trisura policy as a stopgap while the parties continued to negotiate the AQI proposal.  (Doc. No. 83-21 at 4–6.)  On October 14, 2021, Schmitt emailed Petrakis to continue to advocate for a reserve approach, contending that if PowerPay had used the reserve approach, it would have saved "$405,000 over the first 10 months of the program."  (Doc. No. 83-13 at 2.)

The parties' negotiations continued into November.  On November 5, 2021, American Heritage told PowerPay that it believed they had reached an impasse and would "either need to resolve [the impasse] or figure out how to wind down" the program.  (Doc. No. 83-14 at 2.)  The issue was that the AQI insurance proposal was unacceptable to American Heritage, while the reserve approach proposal was unacceptable to PowerPay.  (*Id.*)  Faced with the prospect that American Heritage would stop funding new loans on its platform, PowerPay reluctantly agreed to the reserve approach.  (Doc. No. 83-15.)

On January 1, 2022, American Heritage and PowerPay executed a reserve agreement. (*Id.* at 2.)  Per the agreement, PowerPay would create a cash reserve account that would be used to "offset loan defaults" for loans that American Heritage funded.  (*Id.*)  The agreement also set forth a minimum reserve account balance of 1.5% of the outstanding current balance of active loans and a maximum reserve account balance of 3% of the outstanding current balance of active loans.  (*Id.*)  The reserve agreement would apply to new loans, and PowerPay would obtain "a third-party insurance model for existing loans."  (*Id.*; Doc. No. 86-1 at 21.)

### E.    American Heritage Stops Funding New Loans on PowerPay's Platform

In May 2022, Schmitt called Petrakis to discuss several items, including the rising interest rates of the Federal Reserve.  (Doc. No. 83-19 at 3.)  Schmitt told Petrakis that interest rates were set to rise again, and because American Heritage would increase its rates accordingly, it wanted its rates at PowerPay "to go up 75 basis points if not 100 basis points in a short period of time."  (*Id.*)  During their "very cordial meeting," Schmitt offered to close the program twice, but Petrakis requested that it remain open.  (*Id.* at 2.)  Schmitt agreed, but he predicted that PowerPay would refuse to raise its rates, which "[would] result in the program functionally being shut down."  (*Id.*)

Schmitt's prediction was spot on.  The Federal Reserve again raised interest rates effective June 16, 2022.  (Doc. No. 83-24 at 383.)  The next day, Schmitt called Petrakis to tell him that American Heritage would no longer be funding new loans on PowerPay's platform because the "volume wasn't there and since rates rose and [PowerPay] wasn't willing to increase 50 and then 75 basis points."  (Doc. No. 83-20 at 2.)  Pursuant to the wind-down notice letter dated June 17, 2022, American Heritage stopped financing new loans on PowerPay's platform on September 15, 2022.  (*Id.* at 4.)

### F.    Seaport Sues PowerPay, and PowerPay Countersues Seaport and Hisler

Brewing in the background of American Heritage and PowerPay's negotiations, a dispute between PowerPay and Seaport began to grow.  Though Seaport had introduced American Heritage to PowerPay, PowerPay was not paying Seaport the fees it had earned for making this introduction.  (July 28, 2025 Hr'g Tr. at 24:2–5.)  Eventually, this dispute made its way to court. On April 13, 2023, Seaport sued PowerPay for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment (in the alternative), and for failing to provide proper accounting.  (Doc. No. 1.)  On June 2, 2023, Seaport agreed to voluntarily dismiss its claim for breach of the implied duty of good faith and fair dealing.  (Doc. No. 18.)

Later that month, PowerPay responded to Seaport's complaint with an answer and counterclaims (Doc. No. 20), and it filed an amended answer and counterclaims on July 14, 2023 (Doc. No. 26).  In its amended answer, PowerPay brought a counterclaim for breach of contract against Seaport and a counterclaim for intentional interference with contractual relations against Seaport and Michael Hisler for the communications they had with American Heritage while American Heritage and PowerPay were negotiating the AQI insurance proposal.  (*Id.* at 20–24.)

Seaport now moves for summary judgment on PowerPay's counterclaims. (Doc. No. 65.) PowerPay opposes Seaport's motion (Doc. No. 83), and the Court held oral argument on the motion on July 28, 2025. (Doc. No. 91.) For the reasons below, the Court grants in part and denies in part Seaport's motion for summary judgment.

## II.    Standard of Review

Summary judgment is appropriate when the "materials in the record," show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248. "[A]t the summary judgment stage the judge's function is not [her]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. And at "summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations and alterations omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted); *see also id.* at 325

("[T]he burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case.").  After the moving party has met its burden, the nonmoving party is required to "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 323 (internal quotations omitted); *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322.  "In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 322–23 (internal quotations omitted).  "[T]his standard makes clear that, even though the right to a jury trial is implicated, a nonmoving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings."  *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (internal quotations omitted).  "[U]nsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment.  *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010).

## III.    Discussion

Seaport moves for summary judgment on PowerPay's two counterclaims on several grounds.  (Doc. No. 65.)  First, it argues that PowerPay's counterclaims are time-barred because

they are in fact claims for defamation and commercial disparagement, not breach of contract and tortious interference. (*Id.* at 30–31.) Second, Seaport contends that PowerPay's tortious interference counterclaim fails a matter of law because American Heritage never failed to perform under its contract with PowerPay. (Doc. No. 86 at 13.) Third, Seaport argues that PowerPay lacks proof that it breached its contract with PowerPay or that Hisler engaged in any wrongful intentional conduct that could support PowerPay's tortious interference claim. (Doc. No. 65 at 23–28.) Fourth, Seaport says PowerPay cannot establish a causal link between Seaport and Hisler's conduct and American Heritage's decision to decline AQI's insurance coverage or to stop funding new loans on PowerPay's platform. (*Id.* at 15–23.) And last, Seaport asserts that PowerPay cannot establish damages. (*Id.* at 28–30.)

PowerPay disputes each point. (Doc. No. 83.) First, it argues that its counterclaims are not time-barred because they are indeed claims for tortious interference and breach of contract. (*Id.* at 29–31.) Second, PowerPay contends that its tortious interference counterclaim survives Seaport's motion because its counterclaim is for tortious interference with a prospective contractual relation. (July 28, 2025 Hr'g Tr. at 135:21–136:1.) Third, PowerPay argues that there is record evidence, which shows that (a) Seaport breached its contract with PowerPay and (b) Hisler intentionally interfered with American Heritage and PowerPay's negotiations over the AQI insurance proposal. (Doc. No. 83 at 18–23.) Fourth, PowerPay asserts that reasonable minds can differ on whether Seaport's misconduct was a substantial factor in American Heritage's decision to reject the AQI insurance proposal. (*Id.* at 23–28.) And last, PowerPay argues that it has established damages from Seaport's breach of contract and tortious interference. (*Id.* at 29, 31.) But even if it had not established actual damages, PowerPay

contends that its breach of contract claim could still survive summary judgment because it also seeks nominal damages.  (*Id.* at 28.)

The Court addresses each issue in turn.  As explained below, the Court finds that PowerPay's counterclaim for tortious interference fails as a matter of law, so Seaport's motion for summary judgment is granted on this counterclaim.  Because there are genuine disputes of material fact related to PowerPay's counterclaim for breach of contract, however, the Court denies Seaport's motion for summary judgment on this counterclaim.

### A.    PowerPay's Counterclaims Are Limited to American Heritage's Decision to Reject PowerPay's AQI Insurance Proposal

To start, the Court finds that PowerPay has limited the scope of its counterclaims.  In its amended counterclaims, PowerPay alleges that Hisler and Seaport's tortious interference and Seaport's breach of contract caused American Heritage to (a) decline PowerPay's AQI insurance proposal and (b) stop funding new loans on PowerPay's platform.  (Doc. No. 26 at 20–24.)  Seaport argues in its summary judgment brief that no reasonable factfinder could find that Hisler or Seaport's alleged misconduct caused American Heritage to stop funding new loans on PowerPay's platform.  (Doc. No. 69 at 20–23.)  In support of its argument, Seaport cites to both Schmitt's testimony and his contemporaneous notes, which show that American Heritage stopped funding new loans on PowerPay's platform due to the Federal Reserve's rising interest rates, PowerPay's refusal to increase interest rates, and the decrease in loan volume.  (*Id.*)

Faced with this substantial and uncontroverted evidence, PowerPay responds with a single line in its brief that "discovery has established that Mr. Hisler's conduct was also a substantial factor in American Heritage's termination of loan funding."  (Doc. No. 83 at 29 n.7.)  "Beyond this single, conclusory and unsupported factual assertion," however, PowerPay has made no legal argument to defend its counterclaims as they relate to American Heritage's

decision to stop funding new loans on PowerPay's platform. *Skirpan v. Pinnacle Health Hosps.*, No. 1:07-CV-1703, 2010 WL 3632536, at *7 (M.D. Pa. Apr. 21, 2010), *report and recommendation adopted*, 2010 WL 3632702 (M.D. Pa. Sept. 10, 2010). And at oral argument, PowerPay's counsel confirmed that PowerPay is seeking damages "only for American Heritage's decision to decline PowerPay's AQI proposal." (July 28, 2025 Hr'g Tr. at 145:16–19.) The Court thus finds that PowerPay's counterclaims for tortious interference and breach of contract are limited to American Heritage's decision to reject PowerPay's AQI insurance proposal.

### B. PowerPay's Counterclaims Are Timely

Having clarified the scope of PowerPay's counterclaims, the Court now turns to Seaport's argument that the statute of limitations bars PowerPay's counterclaims for breach of contract and tortious interference because they are in fact claims for defamation and commercial disparagement, which are subject to a one-year statute of limitations. (Doc. No. 69 at 30–32.) Seaport supports this argument by pointing to the fact that PowerPay had initially brought counterclaims for defamation and commercial disparagement before later withdrawing them. (*Id.*) According to Seaport, PowerPay simply repackaged those libel and commercial disparagement claims under a different name. (*Id.*) PowerPay responds that its counterclaims are not time-barred because they are not in fact claims for libel and commercial disparagement. (Doc. No. 83 at 29–31.) The Court agrees with PowerPay.

For one, the Court finds that PowerPay's counterclaims for breach of contract and tortious interference are not "repackaged versions of PowerPay's initial counterclaims for defamation and disparagement." (Doc. No. 69 at 32.) True, PowerPay asserts that Hisler spoke negatively about AQI as part of its tortious interference claim. (Doc. No. 83 at 21.) Yet this "one fact" is "only one of many facts proffered by [PowerPay]" to show Hisler's tortious

14

interference. *Maverick Steel Co. v. Dick Corp./Barton Malow*, 54 A.3d 352, 356 (Pa. Super. Ct. 2012). PowerPay also presents evidence that Hisler advised American Heritage in its negotiation against PowerPay. (Doc. No. 83-10 at 2.) Based on this additional evidence, the Court finds that the "gravamen" of PowerPay's tortious interference claim is "separate and distinct from libel or slander" and is thus not subject to the one-year statute of limitations that applies to those claims. *Maverick Steel Co.*, 54 A.3d at 357–58.

For another, the Court finds that Seaport's reliance on *Evans v. Philadelphia Newspapers, Inc.*, 601 A.2d 330 (Pa. Super. Ct. 1991) is misplaced. In *Evans*, the court evaluated "whether a tortious interference claim, which is based upon identical allegations set forth in an accompanying defamation claim, should be considered duplicative and, as such, be barred by the one[-]year statute of limitations applicable to defamation claims." *Id.* at 332. The court ruled that such a claim is time-barred because plaintiffs "should not be able to circumvent the statute of limitations by merely terming the claim tortious interference when in essence it is one of defamation, subject to a one[-]year limitation of action." *Id.* at 333. By contrast, here, PowerPay's tortious interference claim relies on evidence beyond just defamatory statements, so there is no concern that allowing its claim to proceed would "circumvent the statute of limitations." *Id.* Plus, PowerPay asserts an "economic or commercial injury[,] . . . not simply an injury to reputation." *Cannella v. Brennan*, No. 2:12-CV-1247, 2014 WL 3855331, at *10 (E.D. Pa. Aug. 6, 2014) ("[W]hen the essence of the claim relates to an injury to one's economic interests instead of an injury to one's reputation, the one-year statute of limitations period should not apply."). Because the one-year statute of limitations does not apply to PowerPay's

counterclaims, the Court finds that PowerPay's counterclaims are timely.[2]

### C.    PowerPay's Counterclaim for Tortious Interference Fails as a Matter of Law

Though PowerPay's tortious interference counterclaim is timely, it still fails as a matter of law.  Since the 1800s, the Pennsylvania Supreme Court "has recognized claims for intentional interference with contractual relations."  *Salsberg v. Mann*, 310 A.3d 104, 109 (Pa. 2024).  It "has done so in an array of factual scenarios, including those which involve . . . interference with existing contractual relations and interference with prospective contractual relations."  *Id.* Though Pennsylvania law recognizes claims for interference with both existing and prospective contractual relations, it "distinguishes" these two types of claims.  *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009).  As their different names suggest, one claim deals with interference of an existing contractual relation, while the other deals with interference of a prospective one.

Here, the Court must decide whether PowerPay's counterclaim is for tortious interference an existing or a prospective contractual relation.  Recall that PowerPay has limited its tortious interference counterclaim to Hisler and Seaport's alleged interference with PowerPay's AQI insurance proposal to American Heritage.  PowerPay asserts that this tortious interference counterclaim is based on interference with a prospective contractual relation between PowerPay and American Heritage.  (July 28, 2025 Hr'g Tr. at 135:21–136:1, 138:22–139:2.)  Seaport disagrees.  It says that PowerPay's tortious interference counterclaim is based on interference of an existing contractual relation because there was a "preexisting lender . . . agreement between

---

[2] Seaport does not contest that PowerPay's counterclaims are timely under the statutes of limitations for tortious interference and breach of contract claims.  *See Maverick Steel Co.*, 54 A.3d at 355 ("[T]he tort of contractual interference is subject to a two-year statute [of limitations]."); *Steiner v. Markel*, 968 A.2d 1253, 1255 n.5 (Pa. 2009) ("The statute of limitations for a breach of contract claim is four years.").

American Heritage and PowerPay," which required PowerPay to "purchase credit default insurance." (*Id.* at 151:16–21.)

The Court agrees with Seaport that PowerPay's tortious interference counterclaim is based on alleged interference with an existing contractual relation. Under the American Heritage-PowerPay lender agreement, PowerPay had a contractual duty to provide default insurance on the loans that American Heritage funded on its platform. (Doc. No. 83-4 at 8; July 28, 2025 Hr'g Tr. at 137:18–23.) Given this prior contractual duty under the lender agreement, PowerPay's AQI insurance proposal did not seek to establish a *prospective* contractual relationship with American Heritage. Rather, the AQI insurance proposal sought to maintain American Heritage and PowerPay's *existing* contractual relationship under the lender agreement, whereby American Heritage would fund loans on PowerPay's platform and PowerPay would secure default insurance for such loans. (Doc. No. 83-4 at 2, 8.) Indeed, if PowerPay did not obtain insurance for American Heritage's loans, PowerPay would have breached its contract with American Heritage. (*See* Doc. No. 83-12 at 2 (Schmitt explaining that "without insurance," PowerPay "is in violation of the contract.").)

PowerPay's claimed damages further prove that it has brought a counterclaim for tortious interference with an existing contractual relation. In its brief in opposition to Seaport's motion, PowerPay argues that "it suffered damages in the form of increased insurance costs." (Doc. No. 83 at 29.) Yet, as explained before, PowerPay had a preexisting contractual duty to provide default insurance for American Heritage's loans under the lender agreement. (Doc. No. 83-4 at 8.) Thus, PowerPay's claimed damages stem from the fact that its performance under an existing

contract with American Heritage, *i.e.*, the lender agreement, became more expensive.[3]  In sum, the AQI insurance proposal was simply a way for PowerPay to satisfy its contractual duty to American Heritage under the lender agreement.  PowerPay's counterclaim for tortious interference based on Hisler and Seaport's interference with the AQI proposal is thus for tortious interference of an existing contractual relation.

Once PowerPay's tortious interference counterclaim is properly understood as a counterclaim for tortious interference with an existing contractual relation, it becomes clear that this counterclaim fails as a matter of law.  "Courts in Pennsylvania look . . . to the Restatement (Second) of Torts § 766" to evaluate claims for tortious interference with "an existing contractual relation." *Charbonneau v. Chartis Prop. Cas. Co.*, 680 F. App'x 94, 99 (3d Cir. 2017) (citing *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 482 Pa. 416, 393 A.2d 1175, 1183 (1978)).  Section 766 provides:

---

[3] The Court notes that the Restatement (Second) of Torts Section 766A does permit a claim of intentional interference when a party's performance under a contract with a third party becomes more expensive due to the defendant's interference.  *See* Restatement (Second) of Torts § 766A (1979).  But § 766A applies only when "an actor intentionally interferes with *plaintiff's performance* of his own contract, either by preventing that performance or making it more expensive or burdensome." *Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 660 (3d Cir. 1993) (emphasis added) (internal quotations omitted).  And here, Seaport and Hisler's alleged interference was directed at American Heritage, not PowerPay (the party bringing the tortious interference claim).  (July 28, 2025 Hr'g Tr. at 136:9–21.)  Thus, as all agree, PowerPay does not have a claim under Section 766A.  (*Id.*)

But even if PowerPay did have a claim under Section 766A, it would still not matter because the Pennsylvania Supreme Court has not adopted Section 766A, and the Third Circuit is "not persuaded" that the Pennsylvania Supreme Court ever will. *Gemini Physical Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co.*, 40 F.3d 63, 66 (3d Cir. 1994); *Powerhouse Commc'ns, LLC v. Midstate Commc'n Contractors, Inc.*, No. 1:24-CV-00565, 2024 WL 4253347, at *9 (M.D. Pa. Sept. 20, 2024) ("Pennsylvania has not adopted Section 766A, and the Third Circuit has predicted the Pennsylvania Supreme Court would not.").

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person *by inducing or otherwise causing the third person not to perform the contract*, is subject to liability to the other for the pecuniary loss resulting to the other from *the failure of the third person to perform the contract*.

Restatement (Second) of Torts § 766 (1979) (emphases added).  As Section 766 makes clear, "a defendant is liable for intentional interference with contract only when the defendant induces or otherwise causes a third party not to perform the contract." *Charbonneau*, 680 F. App'x at 99.

Here, it is undisputed that American Heritage did not fail to perform under its contract with PowerPay.  True, the lender agreement permitted PowerPay to substitute the insurance policy on American Heritage's loans.  (Doc. No. 83-4 at 23.)  Yet the agreement specified that any proposed substitution was "[s]ubject to" American Heritage's "consent."  (*Id.*)  Thus, American Heritage's decision to reject the AQI insurance proposal was not a failure to perform the contract; it was instead an exercise of American Heritage's right under the contract.  Without any proof that Seaport and Hisler caused or induced American Heritage not to perform under the lender agreement, PowerPay's tortious interference claim fails as a matter of law.  *See Charbonneau*, 680 F. App'x at 99 ("[A] defendant is liable for intentional interference with contract *only* when the defendant induces or otherwise causes a third *party not to perform the contract*." (emphasis added)); *DeAngelis v. Encompass Home & Auto Ins. Co.*, No. CV 21-2577, 2023 WL 3727005, at *4 (E.D. Pa. May 30, 2023) (explaining that a "tortious interference with contract claim under Pennsylvania law and section 766 of the Restatement (Second) of Torts . . . requires proof that the defendant caused a third party not to perform a contract"); *Al Hamilton Contracting Co. v. Cowder*, 644 A.2d 188, 191 (Pa. Super. Ct. 1994) ("[A] cause of action will not stand unless there has been some act by the defendant which served to deprive the plaintiff of some benefit to which he was entitled by contract."); *cf. ACS Investors, Inc. v.*

19

*McLaughlin,* 943 S.W.2d 426, 431 (Tex. 1997) ("Ordinarily, merely inducing a contract obligor to do what it has a right to do is not actionable [tortious] interference"). The Court thus grants Seaport's motion for summary judgment on this claim.

### D.    There is a Genuine Dispute of Material Fact That Seaport Breached Its Contract with PowerPay

Having dismissed PowerPay's tortious interference counterclaim, the Court now turns to Seaport's argument that PowerPay lacks evidence that Seaport breached the PowerPay-Seaport contract.[4] (Doc. No. 69 at 23–28.) PowerPay's breach of contract counterclaim rests on two provisions of the parties' contract. (Doc. No. 83 at 19.) First, under the heading of "Role of Parties," the contract states that "Seaport shall devote its commercially reasonable efforts and such time as reasonably required by [PowerPay] to perform its duties hereunder so as to advance the interests of [PowerPay]." (Doc. No. 83-3 at 2.) Second, under the heading of "No Representations or Warranties," the contract provides:

> As introducing agent, Seaport has not undertaken and will not undertake any due diligence whatsoever with regard to the any [sic] Transaction and will make no representations or warranties to any Investor or [PowerPay] regarding any Transaction, the information to be supplied by [PowerPay] or [the] Investor, the past, present or future performance of the collateral which might secure any Transaction, the documentation evidencing the Transaction, the suitability of any Transaction as an investment, and any matter whatsoever which relates to any Transaction.

---

[4] In PowerPay's opposition to Seaport's motion, it contends that "Seaport does not even contest that the evidence supports PowerPay's breach of contract claim." (Doc. No. 83 at 18–19.) PowerPay then double downs on this contention with the following footnote: "Indeed, it appears that Seaport challenges only the tortious interference claim, as it contends that 'the cause of action'—singular— 'should therefore be dismissed.' (Seaport Br. at 16.)" (*Id.* at 19 n.1.) This argument is both misleading and incorrect. In the preceding sentence in Seaport's brief, Seaport explained that PowerPay relies on the same alleged acts for both its tortious interference and breach of contract counterclaims, which the record evidence has failed to establish. (Doc. No. 69 at 23.) And, in this section of its brief, Seaport highlighted the ways in which PowerPay's breach of contract claim fails as a matter of law. (*See id.* at 24, 28.) So, the Court finds that Seaport does contest that the evidence supports PowerPay's breach of contract claim.

(*Id.* at 3.)

PowerPay contends that Seaport breached these two provisions because there is evidence that Hisler "advis[ed] American Heritage to reject a term that PowerPay proposed for their Transaction—*i.e.*, AQI insurance—and to demand a reserve program instead." (Doc. No. 83 at 19.) It also contends that Hisler made "representations regarding the marketability of the AQI insurance that PowerPay proposed for their Transactions." (*Id.*) In other words, because Seaport made representations about the collateral of a transaction—default credit insurance—to an investor, it violated both (1) its duty to refrain from making representations about the "collateral which might secure" a transaction and (2) its duty "to advance the interests of PowerPay" in the performance of its duties under the contract.

Taking the evidence in the light most favorable to PowerPay, the Court finds that there is a genuine dispute of material fact that Seaport breached its contract with PowerPay. The evidence shows that Schmitt looped in Hisler while American Heritage and PowerPay were actively discussing the AQI insurance proposal. (Doc. No. 83-3 at 2–3.) According to Hisler, Schmitt emailed him because he wanted "help" with these negotiations. (Doc. No. 83-22 at 307.) Schmitt and Hisler then had a conversation about American Heritage's loans being "unsaleable" on the secondary market if American Heritage agreed to the AQI insurance proposal. (Doc. No. 83-25 at 151.) There is also evidence that, around the same time, Hisler spoke negatively about PowerPay's insurance to Schmitt. (*Id.* at 149–50.) If true, this evidence shows that Hisler made representations about the collateral underlying a transaction. The Court thus finds that there is a genuine dispute of material fact that Seaport breached its contract with PowerPay.

Seaport resists this conclusion on two grounds, but neither persuades. *First*, it argues that the no representations or warranties provision applies only to representations that are made to an investor before a transaction is finalized. (Doc. No. 86 at 9–11.) The Court disagrees. The plain language of the provision does not limit Seaport's duty to refrain from making representations to only prospective investors. (Doc. No. 83-3 at 3.) Nor does the contract extinguish Seaport's duty to refrain from making representations about the "collateral" underlying a transaction once a transaction is finalized. (*Id.*) *Second*, Seaport contends that there is no evidence that Hisler made any representations to American Heritage about PowerPay's insurance product. (Doc. No. 86 at 9–12.) Yet Schmitt testified that during American Heritage's negotiations with PowerPay, he and Hisler discussed that American Heritage's loans would be "unsaleable" on the secondary market if American Heritage agreed to the AQI insurance proposal.[5] (Doc. No. 83-25 at 151.) Plus, Schmitt testified that Hisler also spoke negatively about PowerPay's insurance. (*Id.* at 149–50.) Viewing this evidence in the light most favorable to PowerPay, the Court finds that there is a genuine dispute of material fact that Hisler made representations about AQI insurance, which was the proposed collateral of a transaction.[6] In other words, there is a genuine dispute of material fact that Seaport breached its contract with PowerPay.

---

[5] Seaport also argues that Schmitt never testified that Hisler said the loans would be "unsaleable." (Doc. No. 86 at 12–13.) Yet when asked if Hisler "sa[id] something negative about the insurance," Schmitt replied that "we would have a discussion that it was unsaleable, the product, if we went through with . . . AQI." (Doc. No. 83-25 at 151.) And when Schmitt was asked if he was the one who had said this, Schmitt clarified that "[Hisler] would have told me [that] back. We would have had a conversation." (*Id.*) Based on this testimony, it would be in error for the Court to find that there is no genuine dispute of material fact that Hisler did not make any representations about AQI to Schmitt.

[6] Though Seaport points out that representations refer to statements of fact, the Court finds that Hisler's comments, if true, could constitute representations because it was a statement of fact that American Heritage's loans would be unsaleable on the secondary market if American Heritage agreed to the AQI proposal. (Doc. No. 86 at 10 (citing *Black's Law Dictionary* 1301 (6th ed. 1990)).)

### E.    Reasonable Minds Could Differ on Causation

Seaport next argues that no reasonable factfinder could find that its alleged breach of contract caused American Heritage to decline the AQI insurance proposal. (Doc. No. 69 at 15–20.) PowerPay responds that reasonable minds could differ on the issue of causation, which is enough to preclude summary judgment. (Doc. No. 83 at 23–28.) The Court agrees with PowerPay.

For its breach of contract counterclaim, PowerPay must show "a causal relationship between the breach and the loss." *Brader v. Allegheny General Hosp.*, 64 F.3d 869, 878 (3d Cir. 1995). The Pennsylvania Supreme Court has succinctly explained the role of a trial court when assessing causation at the summary judgment stage:

> Whether in a particular case that standard [plaintiff's burden of preponderance of the evidence] has been met with respect to the element of causation is normally a question of fact for the jury; the question is to be removed from the jury's consideration *only where it is clear that reasonable minds could not differ on the issue. In establishing a prima facie case, the plaintiff need not exclude every possible explanation* [. . .]; it is enough that reasonable minds are able to conclude that the preponderance of the evidence shows defendant's conduct to have been a substantial cause of the harm to plaintiff.

*Summers v. Certainteed Corp.*, 997 A.2d 1152, 1163–64 (Pa. 2010) (cleaned up).

Based on the record evidence, the Court finds that reasonable minds could differ on whether Seaport's alleged breach of contract was a substantial factor in American Heritage's decision to reject PowerPay's AQI insurance proposal. *First*, Hisler, who agreed that he was a "trusted resource" for American Heritage, advised American Heritage not to "agree to anything currently" and "just say 'we'll think about it'" while American Heritage and PowerPay were actively negotiating the AQI proposal. (Doc. Nos. 83-23 at 473; 83-10 at 2.) *Second*, Schmitt and Hisler discussed that American Heritage's loans would be "unsaleable" on the secondary

23

market if American Heritage went through with the AQI insurance proposal.  (Doc. No. 83-25 at

151.)  *Third*, it is undisputed that "loan participation," *i.e.*, the sale of loans on the secondary

market, "was an important part of American Heritage's lending strategy and business plan."

(Doc. No. 86-1 at 6.)  Given this evidence, the Court finds that reasonable minds could differ on

the issue of causation, and a reasonable trier of fact could conclude that Seaport's breach of

contract was a substantial factor in American Heritage's decision to decline PowerPay's AQI

proposal.  Summary judgment is thus inappropriate on causation grounds.  *See First Sealord Sur.*

*v. Durkin & Devries Ins. Agency*, 918 F. Supp. 2d 362, 389 (E.D. Pa. 2013) (denying summary

judgment on a breach of contract claim because plaintiff submitted sufficient evidence that

defendant's breach of contract was a substantial factor in plaintiff's damages); *Rost v. Ford*

*Motor Co.*, 151 A.3d 1032, 1049 (Pa. 2016) ("This Court has consistently and without exception

held that issues of causation are matters of fact for the jury to decide.").

     Seaport resists this conclusion, but it puts all its eggs in one basket, or in this case, one

man—Brian Schmitt.  (Doc. No. 86 at 5–9.)  It argues that PowerPay cannot establish causation

because Schmitt testified that Hisler's conduct had no influence on American Heritage's decision

to reject the AQI insurance proposal.  (*Id.* at 5.)  Based on Schmitt's testimony and emails,

Seaport also contends that American Heritage rejected AQI solely because of its foreign

domicile and common ownership with PowerPay.  (*Id.* at 5–6.)  Even though Schmitt testified to

these facts, the Court cannot grant summary judgment on this basis alone.  At this stage, the

Court "may not make credibility determinations."  *Marino v. Industrial Crating Co.*, 358 F.3d

241, 247 (3d Cir. 2004).  And here, Seaport asks the Court to fully credit Schmitt's testimony

despite the existence of evidence that undermines such testimony.  Because "[c]redibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

24

facts are" functions for the trier of fact, the Court denies Seaport's motion for summary judgment on the issue of causation. *Anderson*, 477 U.S. at 255.

### F.    PowerPay Has Suffered Actual Damages

Seaport last contends that PowerPay's counterclaim for breach of contract must be dismissed because PowerPay cannot establish that it suffered any damages from Seaport's alleged breach of contract. (Doc. No. 69 at 28–30.) PowerPay responds that (1) it does not have to prove damages for its breach of contract counterclaim at this stage and (2) it has suffered actual damages "in the form of increased insurance costs." (Doc. No. 83 at 29.)

The Court agrees with PowerPay that it need not show actual damages for its breach of contract counterclaim to survive summary judgment. Under Pennsylvania law, "actual damages need not be established to survive summary judgment on a contract claim." *N. Penn Towns, LP v. Concert Golf Partners, LLC*, No. CV 19-4540-KSM, 2022 WL 2985632, at *31 (E.D. Pa. July 28, 2022). This rule stems from the fact that "if a party is able to prove breach of contract but can show no damages flowing from the breach, the party is entitled to recover nominal damages." *Wolfe v. Allstate Prop. & Cas. Ins. Co.*, 790 F.3d 487, 497 (3d Cir. 2015). Summary judgment "on the sole basis of absence of provable damages, therefore, is generally improper." *Id.* (internal quotations omitted). Though Seaport contends that PowerPay cannot rely on this caselaw because it did not explicitly request nominal damages in its pleadings, the Court has granted PowerPay's motion for leave to amend its counterclaim to explicitly add a request for nominal damages. The Court thus denies Seaport's motion for partial summary judgment based on PowerPay's alleged failure to show actual damages from Seaport's breach of contract. *See Zeno v. Ford Motor Co.*, 480 F. Supp. 2d 825, 834 (W.D. Pa. 2007) ("In light of the law of Pennsylvania allowing nominal damages for a breach of contract, summary judgment cannot be

granted for failure to show damages.").

The Court also disagrees with Seaport's contention that PowerPay cannot show any actual damages from Seaport's breach of contract. (Doc. No. 69 at 28–29.) To establish damages, "a plaintiff must give a factfinder evidence from which damages may be calculated to a reasonable certainty." *Ware v. Rodale Press, Inc.,* 322 F.3d 218, 225–26 (3d Cir. 2003) (internal quotations omitted). Damages cannot be too speculative, but this inquiry "has nothing to do with the difficulty in calculating the amount [of damages]." *Printed Image of York, Inc. v. Mifflin Press, Ltd.*, 133 A.3d 55, 60 (Pa. Super. Ct. 2016) (internal quotations omitted). Instead, it "deals with the more basic question of whether there are identifiable damages." *Id.* (internal quotations omitted).

Here, the Court finds that there are identifiable damages because PowerPay has evidence that it paid more in insurance premiums for American Heritage's loans than it would have if American Heritage had agreed to the AQI proposal. (*See* Doc. No. 73-2 at 22–24.) Indeed, PowerPay presents evidence that it would have paid a monthly premium rate of 0.14% for insurance through AQI, but it ultimately had to pay a monthly premium rate of 0.16% for insurance through Fortegra, a third-party provider. (*Id.*; Doc. Nos. 76-9 at 2; 83-12 at 2.) Though Seaport contests this evidence (Doc. No. 73 at 26–28), these factual disputes go not to the "fact of damages," but rather the "amount of damages." *Aircraft Guar. Corp. v. Strato-Lift, Inc.*, 991 F. Supp. 735, 740 (E.D. Pa. 1998). Summary judgment is thus inappropriate. *See AMCO Ins. Co. v. Emery & Assocs., Inc.*, 926 F. Supp. 2d 634, 647 (W.D. Pa. 2013) ("Damages are speculative only if the uncertainty concerns the fact of damages rather than the amount.").

**IV.    Conclusion**

In sum, the Court grants in part and denies in part Seaport's motion for summary judgment.  The Court dismisses PowerPay's counterclaim against Seaport and Michael Hisler for tortious interference with contractual relations.  But genuine disputes of material fact preclude summary judgment on PowerPay's breach of contract counterclaim against Seaport, so this claim proceeds to trial.  Accordingly, the Court reserves its determination as to the prevailing party for trial.